Robert Keith MEADOWS *v.* STATE of Arkansas

CR 86-166                                     722 S.W.2d 584

Supreme Court of Arkansas
Opinion delivered January 26, 1987

*Terry L. Crabtree*, Public Defender, and *N. Michael Yarbrough*, Asst. Public Defender, for appellant.

*Steve Clark*, Att'y Gen., by: *Clint Miller*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. The principal issue in this case is whether an unborn viable fetus is a "person" as that term is used in the manslaughter statute. There is little dispute about the facts. The appellant, while intoxicated, drove his car in a reckless manner, veered across the center line of the highway and struck an oncoming car being driven by Randy Waldrip. As a result, Randy Waldrip was killed and an unborn viable fetus, carried by Vanessa Weicht, a passenger in appellant's car, was also killed. The appellant was charged with, and convicted of, two counts of manslaughter; one for killing Randy Waldrip and the other for killing the unborn fetus.

Appellant's first argument is that reckless killing of an unborn viable fetus is not included within the purview of the manslaughter statute. The argument has merit. Our statute provides that one commits manslaughter if he "recklessly causes the death of another person." Ark. Stat. Ann. § 41-1504(1)(c) (Repl. 1977). The word "person" is not defined.

The applicable rule of construction is that the common law in force at the time the statute was passed is to be taken into account in construing undefined words of the statute. *State v. Pierson*, 44 Ark. 265 (1884). The quoted statute, which is a part of the Criminal Code, was enacted in 1975, while a pre-code manslaughter statute goes back to the revised statutes which became effective in 1839. Ark. Stat. Ann. § 41-2201 and § 41-2209 (Repl. 1964). The revised statute used the term "human being" rather than the presently used "person," but the terms are synonymous in common law.

In ascertaining the common law, we look not only to our own cases, but to early English cases, early writers on the common law, and cases from other states. Ark. Stat. Ann. § 1-101 (Repl. 1976); *Baker v. State*, 215 Ark. 851, 223 S.W.2d 809 (1949). In so looking, we find that at common law, in both 1839 and in 1975,

an unborn fetus was not included within the definition of a "person" or "human being," and therefore, the killing of a viable unborn child was not murder. *Rex* v. *Brain*, 6 Carr. & P. 349, 172 Eng. Rep. 1272 (1834); *Rex* v. *Sellis*, 7 Carr. & P. 850, 173 Eng. Rep. 370 (1836); and *Rex* v. *Crutchley*, 7 Carr. & P. 814, 173 Eng. Rep. 355 (1836); *Clarke* v. *State*, 117 Ala. 1, 23 So. 671 (1898); *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 625-27, 470 P.2d 617, 40 A.L.R.3d 420 (1970); *Ranger* v. *State*, 249 Ga. 315, 290 S.E.2d 63 (1982); *People* v. *Greer*, 79 Ill. 2d 103, 37 Ill. Dec. 313, 402 N.E.2d 203 (1980); *State* v. *Winthrop*, 43 Iowa 519 (1876); *Hollis* v. *Commonwealth*, 652 S.W.2d 61 (Ky. 1983); *State* v. *Gyles*, 313 So. 2d 799 (La. 1975); *People* v. *Guthrie*, 97 Mich. App. 226, 293 N.W.2d 775 (1980); *State in the Interest of A.W.S.*, 182 N.J. Super. 278, 440 A.2d 1144 (1981); *State* v. *Willis*, 98 N.M. 771, 652 P.2d 1222 (1982); *People* v. *Hayner*, 300 N.Y. 171, 90 N.E.2d 23 (1949); *State* v. *Sogge*, 161 N.W. 1022 (N.D. 1917); *State* v. *Dickinson*, 28 Ohio St. 2d 65, 275 N.E.2d 599 (1971); *State* v. *Amaro*, 448 A.2d 1257 (R.I. 1982); *Harris* v. *State*, 28 Tex. App. 308, 12 S.W. 1102 (1889); *State* v. *Larsen*, 578 P.2d 1280 (Utah 1978); *Bennett* v. *State*, 377 P.2d 634 (Wyo. 1963); Annot., 40 A.L.R.3d 444 (1971). *State ex. rel. Atkinson* v. *Wilson*, 332 S.E.2d 807 (W. Va. 1984). *See also* W. LaFave & A. Scott, *Criminal Law* § 67 (1972); 2 W. LaFave & A. Scott, *Substantive Criminal Law* § 7.1(c) (1986); R. Perkins & R. Boyce, *Criminal Law* § 1B (3d ed. 1982); 2 C. Torcia, *Wharton's Criminal Law* § 114 (14th ed. 1979); F. Bailey & H. Rothblatt, *Crimes of Violence: Homicide and Assault* § 576 (1973); 40 Am. Jur. 2d *Homicide* § 9; and 40 C.J.S. *Homicide* § 2(b).

In its brief the State acknowledges that the common law is as set out above, but urges us to alter it. Thus, the critical issue is whether a court ought to create a new common law crime.

■ In their book entitled *Criminal Law, supra*, at 57-69, LaFave and Scott discuss at length the issue of whether courts can create new common law crimes. They indicate that the modern view finds diminished authority for courts doing so. They conclude:

It is only natural that judges should create crimes from general principles in medieval England, because such

legislature as there was sat only infrequently and legislation was scanty. Today in the United States, as in modern England, the various legislatures meet regularly. The principal original reason for common law crimes has therefore disappeared.

We have recently said, "It is well settled that it is for the legislative branch of a state or federal government to determine the kind of conduct that constitutes a crime and the nature and extent of the punishment which may be imposed." *Sparrow* v. *State*, 284 Ark. 396, 397, 683 S.W.2d 218 (1985).

There are two fundamental policy reasons which make it appropriate for this Court to defer the creation of new crimes to the legislature. First, aside from having the primary authority to create new crimes, the General Assembly is composed of members, proportioned according to population and geography, who are elected at more frequent intervals than are members of this Court. The General Assembly is more closely attuned and more representative of the public will than is this Court. Second, the General Assembly has committees which conduct hearings in a non-adversary manner in order to anticipate all factual situations which may prospectively occur, and it is able to make more distinctions as to the degrees of offenses and to graduate the penalties to match the severity of the offenses. This Court would be limited to making a ruling solely on the adversarily developed facts before it. *State ex rel. Atkinson* v. *Wilson*, 332 S.E.2d 807, 810 (W. Va. 1984); Aldisert, *The Nature of the Judicial Process: Revisited*, 49 U. Cin. L. Rev. 1 (1980). Accordingly, we decline to create a new common law crime by judicial fiat, but, instead, defer to the legislative branch.

The highest courts of our sister states overwhelmingly agree with our philosophy. Twenty-four states have held, under facts similar to the ones at bar, they would not create new common law crimes. *See, e.g,: Clarke* v. *State*, 117 Ala. 480, 23 So. 67 (1898); *Keeler* v. *Superior Court*, 2 Cal. 3d 619, 87 Cal. Rptr. 481, 470 P.2d 617 (1970); *State* v. *McCall*, 458 So. 2d 875 (Fla. Dist. Ct. App. 1984); *White* v. *State*, 238 Ga. 224, 232 S.E.2d 57 (1977); *People* v. *Greer*, 79 Ill. 2d 103, 37 Ill. Dec. 313, 402 N.E.2d 203 (1980); *Hollis* v. *Commonwealth*, 652 S.W.2d 61 (Ky. 1983); *State* v. *Gyles*, 313 So. 2d 799 (La. 1975); *Smith* v. *State*, 33 Me.

48 (1851); *People* v. *Guthrie*, 97 Mich. App. 226, 293 N.W.2d 775; *State* v. *Soto*, 378 N.W.2d 625 (Minn. 1985); *State* v. *Doyle*, 205 Neb. 234, 287 N.W.2d 59 (1980); *State in the Interest of A.W.S.*, 182 N.J. Super. 278, 440 A.2d 1144 (N.J. Super. Ct. App. Div. 1981); *State* v. *Willis*, 98 N.M. 771, 652 P.2d 1222 (N. M. Ct. App. 1982); *People* v. *Hayner*, 300 N.Y. 171, 90 N.E.2d 23 (1949); *State* v. *Sogge*, 36 N.D. 262, 161 N.W. 1022 (1917); *State* v. *Dickinson*, 28 Ohio St. 2d 65, 275 N.E.2d 599 (1971); *State* v. *McGee*, 1 Add. 1 (Pa. 1791); *State* v. *Amaro*, 448 A.2d 1257 (R.I. 1982); *Morgan* v. *State*, 148 Tenn. 417, 256 S.W. 433 (1923); *Harris* v. *State*, 28 Tex. App. 308, 12 S.W. 1102 (Tex. 1889); *State* v. *Larsen*, 578 P.2d 1280 (Utah 1978); *Lane* v. *Commonwealth*, 219 Va. 509, 248 S.E.2d 781 (1978); *Huebner* v. *State*, 131 Wis. 162, 111 N.W. 63 (1907); *Bennett* v. *State*, 377 P.2d 634 (Wyo. 1963). On the other hand, only two states have created a new common law crime under facts similar to those of the case at bar. In its brief the State asks us to follow the holding of those two states. We decline to do so. In *State* v. *Horne*, 282 S.C. 444, 319 S.E.2d 703 (1984), the South Carolina court, without discussing its power to create a new common law crime, prospectively held that the murder of a viable unborn fetus would be a crime. In *Commonwealth* v. *Cass*, 392 Mass. 799, 467 N.E.2d 1324 (1984), the Massachusetts court, by a 4-3 vote, held that a viable fetus was a "person" for purposes of that state's vehicular homicide statute. The court relied on and extended an earlier holding in the civil case of *Mone* v. *Greyhound Lines, Inc.*, 368 Mass. 354, 331 N.E.2d 916 (1975), which held that a viable fetus was a "person" within that state's wrongful death statute. In doing so, the Massachusetts court stressed that its vehicular homicide statute was enacted shortly after the *Mone* decision. Because of that unusual fact the court reasoned: "Despite the fact that *Mone* was a civil case, we can reasonably infer that, in enacting [the vehicular homicide statute], the Legislature contemplated that the term 'person' would be construed to include viable fetuses." *Id.* at 1326.

We do not have such a holding in a civil case. In fact, in a somewhat comparable case our holding was just the opposite. In *Carpenter* v. *Logan*, 281 Ark. 184, 662 S.W.2d 808 (1984), we held that a viable fetus born dead was not a "deceased person" within the meaning of the probate code. In addition, we clearly

stated that any attempt to expand the probate code to include fetuses would require action by the General Assembly.

An even more compelling reason dictates that we cannot infer, as the Massachusetts court did, that legislative intent was for the term "person" to include a viable fetus. An early feticide statute, Ark. Stat. Ann. § 41-2223 (Repl. 1964) provided that "the willful killing of an unborn, quick child, by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be adjudged manslaughter." Under the statute one could be convicted of voluntary manslaughter for intentionally driving an automobile in such a manner that it struck a pregnant woman, killing the fetus. *Tiner* v. *State*, 239 Ark. 819, 394 S.W.2d 608 (1965). However, that manslaughter statute, specifically relating to unborn children, was expressly repealed by Act 928 of 1975. Obviously, the legislative intent shown, if any, is that the killing of a viable fetus is not manslaughter.

Finally, even if we chose to follow the holdings of the South Carolina and Massachusetts Courts, we could not affirm this case. Both of those courts, in their respective opinions, recognized that their opinions could only be applied prospectively or else there would be a deprivation of due process. *See Bouie* v. *City of Columbia*, 378 U.S. 347 (1964). Accordingly, we must reverse and dismiss the manslaughter conviction for killing the unborn fetus.

We do not address appellant's second point of appeal because it goes only to the case involving the reckless killing of the unborn fetus and is therefore moot.

Appellant's third point of appeal concerns the reckless killing of Randy Waldrip, driver of the oncoming car. During opening statement, the prosecutor outlined the state's evidence and then, with clear reference to the defendant asked, "What's he going to say after all this evidence is presented?" The question was highly improper. The constitutional prohibition against the prosecutor commenting on the right of a defendant to remain silent applies to opening statement. *Clark* v. *State*, 256 Ark. 658, 509 S.W.2d 812 (1974). Appellant did not move for a mistrial, but his assignment of error is, "The trial court erred in not declaring a mistrial based upon an improper prejudicial comment

by the prosecution during the State's opening to the jury." Clearly, the comment in opening statement, without more, was not such a prejudicial statement that it required the court, on its own motion, to declare a mistrial. Indeed, a mistrial, even if requested, was not warranted as no further reference was made to appellant's post-arrest silence and the proof of guilt was overwhelming. For our most recent review of the harmless error rule in cases involving violation of the federal constitutional right to remain silent, see Numan v. State, 291 Ark. 22, 722 S.W.2d 276 (1987).

Appellant's final point is that his conviction for the manslaughter of Randy Waldrip must be reversed because of the prejudice caused by the evidence adduced in the jointly tried case involving the viable fetus. Indubitably, some of the evidence concerning the fetus could have inflamed the jury. The State introduced evidence concerning the viability of the fetus at various stages of gestation, and then presented detailed evidence about the death of the fetus as a result of "slow asphyxiation" caused by a "shearing" of the umbilical cord, much like an astronaut might die in outer space if he lost his "lifeline" to his orbiting space vehicle. Under Ark. Unif. R. Evid. Rule 401, such a vivid and detailed explanation of the death of the fetus was neither relevant, nor properly admissible, in the Waldrip case. However, the erroneous evidence would not have influenced the jury on the question of guilt or 'innocence, but could have improperly influenced the jury in fixing the sentence. Because of this possible prejudice in the fixing of the sentence, we affirm the judgment of conviction but reduce the sentence to the minimum the jury could have set for the offense of which the appellant was convicted. Rogers v. State, 260 Ark. 232, 538 S.W.2d 300 (1976). The sentence is thus reduced to three years confinement. See Ark. Stat. Ann. § 41-1504(3) (Repl. 1977) and Ark. Stat. Ann. § 41-901 (Supp. 1985).

Accordingly, should the Attorney General decide, within 17 days, to accept this reduction of sentence, the judgment will be affirmed as modified. Otherwise, the judgment will be reversed and the cause remanded for a new trial. See Rogers v. State, supra.

Affirmed in part as modified at the option of Attorney

General and reversed in part.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I do not share the majority's concern that this court would be "creating a common law crime" by holding that an unborn, fully viable fetus[1] is a "person" within the meaning of our manslaughter statute.

This is not a "new crime." This court would not in any sense be "creating" a crime. The crime was created legislatively as part of the Revised Statutes, which took effect in 1838. What we would be doing by affirming the trial court is what courts traditionally and necessarily do—interpret an act of the legislature for the purpose of giving effect to what we perceive to be the legislative intent.

The act, Ark. Stat. Ann. § 41-1504(1)(c) (Repl. 1977), is quite clear:

> *Manslaughter*—(1) A person commits manslaughter if: (c) he recklessly causes the death of another person.

Prior Arkansas law specifically included in the offense "the driving of any vehicle in reckless, willful or wanton disregard of the safety of others. . ." See Commentary, § 41-1504. No intent is required. *Seabourn v. State*, 236 Ark. 175, 365 S.W.2d 133 (1963).

The issue then is simply whether the legislature intended "person" to include a full term unborn child in 1975 when our current statute was framed to take effect on January 1, 1976. I submit that logic and common sense weigh on the side of the affirmative.

I concede the weight of authority holds that an unborn child is not a "person" under the common law view of homicide. The division among the states seems to stand at 22 to 9. See LaFave and Scott, *Substantive Criminal Law*, § 7.1(c) (1986) and 40 A.L.R.3d 444 (1971). But a number of those cases cited by the majority date from the turn of the century and before: *Clarke* v.

---

[1] The mother testified her child was two weeks overdue when the collision occurred. Her obstetrician estimated the age of the child, a boy, at 40 weeks at the time of death.

*State*, 117 Ala. 480, 23 So. 67 (1898); *Smith* v. *State*, 33 Me. 48 (1851); *State* v. *Sogge*, 36 N.E. 262, 161 N.W. 1022 (1917); *State* v. *McGee*, 1 Add. 1 (Pa. 1791); *Morgan* v. *State*, 148 Tenn. 417, 256 S.W. 433 (1923); *Huebner* v. *State*, 131 Wis. 162, 111 N.W. 63 (1907). Some involve homicide of a higher degree than manslaughter, crimes involving specific intent as opposed to wanton conduct, where the malice was not directed toward the fetus and the issue of transferred intent complicated the decisional process.

More importantly, the principle which gives commonality to those cases on which the majority relies is based on the "born alive rule," that is, that there could be no liability under the common law for crimes against a fetus unless the child was born alive. The rule is outmoded and entirely discredited. It had its origins in the fourteenth century (see 40 A.L.R.3d at p. 446) and gained acceptance during an age in which still births exceeded live births and medical knowledge concerning viability was nonexistent. Justice James L. Ryan, of the Michigan Supreme Court, dissenting in *People* v. *Guthrie*, 417 Mich. 1006, 334 N.W.2d 616 (1983) describes the rule:

> The "rule" is generally understood to derive from the impossibility, 300 years ago, of determining whether and when a fetus was living and when and how it died, and the consequent necessity to preclude the fundamental inquiry whether a fetal death was a human death.

> To hold as a matter of law in the waning years of the twentieth century that the question of the personhood or humanity of a viable unborn child in the ninth month of gestation is governed by a common law rule of proof invented by the venerable but fallible Sir Edward Coke in the seventeenth century, to accommodate the medical and scientific impossibility of then proving the viability of a fetus, is disingenuous reasoning in the extreme.

We are not bound by outmoded notions founded on a lack of information when scientific knowledge now provides clear and reliable information. The exact cause of the death of this fetus was fully provided by the proof and was shown to be directly attributable to the collision. It seems patently illogical to me to hold that if an infant dies immediately before birth it is not a

"person," but if it dies immediately after birth it is a "person."

I believe we should reject the born alive rule and follow the course taken by the recent cases of *State* v. *Horne*, 282 S.C. 444, 319 S.E.2d 703 (1984); *State* v. *Burrell*, 699 P.2d 499 (Kan. 1985) and *Commonwealth* v. *Cass*, 392 Mass. 799, 467 N.E.2d 1324 (1984), where it was said:

> We think that the better rule is that infliction of prenatal injuries resulting in the death of a viable fetus, before or after it is born, is homicide. If a person were to commit violence against a pregnant woman and destroy the fetus within her, we would not want the death of the fetus to go unpunished. We believe that our criminal law should extend its protection to viable fetuses.

As to *Carpenter* v. *Logan*, 281 Ark. 184, 662 S.W.2d 808 (1984), we declined to decide whether an unborn fetus has a cause of action because the probate proceeding was wholly ex parte. On the issue of civil liability, it might be noted that the Supreme Court of Pennsylvania lists thirty jurisdictions as recognizing survival and wrongful death actions on behalf of stillborn children. See *Amadio* v. *Levin*, 50 A.2d 1085 (1985).

Nor would I hold that the appellant is entitled to fair warning that his conduct in this instance should not be criminalized based on a narrow interpretation of "person." The cases cited by the appellant have no bearing on the type of culpable misconduct demonstrated by this record and warrant no extended discussion. The mother whose child was killed and who lived with the appellant at the time of the collision and trial, testified the appellant had been drinking all day and had smoked marijuana cigarettes. Large amounts of beer were consumed and appellant's blood alcohol level was .18 following the collision. While the exact consequences may not have occurred to appellant, the criminality of his conduct could hardly have been in doubt. On that basis *Bouie* v. *City of Columbia*, 378 U.S. 347 (1964) bears no similarity to the facts before us. In *Bouie* conduct which reasonably could have been thought lawful was held to be subject to fair warning prior to the applicability of a broader statutory construction which would have rendered such conduct unlawful.

I would affirm the judgment.